UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BILLIE CONLEY, JR. | ) | CIVIL ACTION NO. |
| Plaintiff | ) | 3:20-CV-284-CSH |
| | ) | |
| v. | ) | |
| | ) | |
| 1008 BANK STREET, LLC D/B/A | ) | |
| RIVERSIDE AUTO II, | ) | |
| Defendant | ) | |
| | ) | MAY 14, 2020 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT**

## I.     INTRODUCTION

This is an action brought by a consumer against an automobile dealership for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.,* the Connecticut Retail Installment Sales Finance Act, Conn. Gen. Stat. § 36a-770 *et seq.* ("RISFA"), and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq.* Plaintiff Billie Conley, Jr. ("Plaintiff" or "Conley") seeks a monetary judgment of $16,929.24 and attorney's fees of $8,270. Plaintiff also seeks an order from this Court that Plaintiff can sell the Vehicle and apply the proceeds to the judgment.

## II.     STANDARD OF REVIEW

In *GE Group Life Assurance Company v. Ruzynski*,[1] the principles applicable to entry of a judgment following default were well-summarized as follows:

> It is well established that a party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the sound judicial discretion of the court.[2] In civil cases, however, "where a party fails to

---

[1] 2004 WL 243346 (D. Conn. 2004).
[2] *Id.* citing *Cablevision of S. Conn. Ltd. Partnership v. Smith*, 141 F.Supp.2d 277, 281 (D. Conn. 2001) (quoting *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir.1999)).

respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party."[3]

In deciding the extent of damages to be awarded in a default judgment, the court must consider several factors including (1) the monetary award requested; (2) the prejudice suffered by the Plaintiff; (3) whether or not the default is clearly established and (4) the nature of the Plaintiff's claims against the defendant.[4]

With respect to the above criteria, the Second Circuit has provided guidance, stating:

> The outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give [Plaintiffs] a 'blank check' to recover from [defendant] any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded....[5]

"[W]here the quantum of damages is not liquidated and is not a readily ascertainable sum, the plaintiff must prove damages before the entry of a final default judgment."[6] "In reaching the decision as to the amount a plaintiff is entitled to recover, the Court may rely on detailed affidavits or documentary evidence to determine the appropriate sum [to be awarded pursuant to] the default judgment."[7] "A court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation."[8]

---

[3] *Id. citing Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir.1984).
[4] *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1152 n. 11 (2d Cir. 1995) (citing 10 Moore's Federal Practice § 55.20[2][b]).
[5] *Greyhound Exhibit Group, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992).
[6] *Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992)
[7] (Internal quotation marks omitted.) *Teamsters Local 639-Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 107 (D.D.C. 2008).
[8] *Hunt v. Inter–Globe Energy, Inc.*, 770 F.2d 145, 148 (10th Cir.1985)(*citing Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir.1983))

However, in making this determination and evaluating the allegations asserted against the defendant, the court may "deem[ ] all the well-pleaded allegations in the pleadings to be admitted" by the defendant.[9]

### III.    RELEVANT FACTS

The following facts are set forth in the Plaintiff's Affidavit or as referenced in the Complaint or attached exhibits.

Prior to July 10, 2019, Conley saw a 2012 BMW 750i (the "Vehicle") for sale on a Facebook Marketplace advertisement posted by Defendant 1008 Bank Street, LLC d/b/a Riverside Auto II ("Riverside Auto" or "Defendant") for a sale price of $15,900. The advertisement did not disclose a dealer conveyance fee.[10]

On or about July 10, 2019, Conley visited Riverside Auto to test drive the Vehicle, and he met with Riverside Auto's salesman, Sean Richard ("Richards").[11] Riverside Auto regularly extends credit to car purchasers and entered into such transactions at least 25 times in the calendar year preceding the sale to Plaintiff.[12] After Conley completed a credit application, Richards told him the sale price of the Vehicle would be $16,500.[13] Conley objected to the price, and Richards told him the price had been increased price because of Conley's credit rating.[14] Conley agreed to purchase the Vehicle, and further agreed to pay a down payment of $6,500.00.[15]

Unbeknownst to Conley, two days later, on  July 13, 2019, Riverside Auto prepared a Retail Installment Contract (the "Contract") and electronically forged his

---

[9] *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997).
[10] Conley Affidavit, ¶ 3; Exhibit 1.
[11] Id., ¶ 5.
[12] Complaint, ¶ 25.
[13] Conley Affidavit, ¶ 6.
[14] Id., ¶ 7.
[15] Id., ¶ 8.

signature on the contract and submitted the forged Contract to Sensible Auto Lending, LLC ("Sensible").[16] Conley could not have signed the forged Contract on July 13, 2019 because he was out of state working in Maine on that date. Riverside Auto called him to obtain a text message code from that he received from Sensible on July 13, 2019. Plaintiff was unaware as to the purpose of the code at the time and told Riverside Auto the information, which it used to forge Plaintiff's electronic signature.[17]

The forged Contract listed the price of the Vehicle as $17,566.80, including sales tax of $1,066.80, and a cash down payment of $6,250.00, even though Conley had not yet paid a down payment. The forged Contract also included a charge of $395 for GAP[18], which Conley neither requested nor desired.[19] The forged Contract included an assignment to Sensible.[20]

Conley returned to Riverside Auto on July 16, 2019 to pay the down payment, finalize the purchase and sign the contract documents.[21] Riverside Auto presented Conley with the forged Contract that had already been assigned to Sensible. Riverside Auto instructed him to sign next to the forged electronic signature.[22,23] Conley noticed the GAP charge on the Contract, and when he asked Riverside Auto about the charge,

---

[16] Id., ¶ 9.
[17] Id., ¶¶ 10-11.
[18] GAP, or guaranteed asset protection, is only present in a financed transaction. "In the event of an accident in which you've badly damaged or totaled your car, gap insurance covers the difference between what a vehicle is currently worth (which your standard insurance will pay) and the amount you actually owe on it. "What is gap insurance?" Insurance Information Institute, available at https://www.iii.org/article/what-gap-insurance (Last accessed April 27, 2020).
[19] Id., ¶ 12.
[20] Id., ¶ 13; Exhibit 2.
[21] Id., ¶ 15.
[22] Id., ¶ 16.
[23] Although Conley did sign a copy of the contract, it was the original, forged e-signed copy that was assigned by Riverside Auto to Sensible, and that assignment pre-dated Conley's signature.

Riverside Auto told him a GAP addendum was required by the lender, Sensible Auto Lending.[24]

After Conley signed the Contract, Riverside Auto requested he pay the $6,500 down payment. Conley questioned the amount of the down payment because the Contract listed only $6,250, and Riverside Auto told him that $150 of the down payment would be applied to registration costs, and the remaining $100 would be applied towards his first loan payment. Plaintiff gave Riverside Auto a bank check in the amount of $6,500.[25]

Soon after taking delivery of the Vehicle, defects with the Vehicle manifested including smoke coming from the Vehicle's exhaust, problems with the tires and a foggy mirror. Additionally, the tires were worn and unsafe.[26] Plaintiff was able to get most repairs performed under manufacturer's warranty, however, he paid $1,103.27 to Town Fair Tire for new tires and installation; $1,295.56 to BMW of North Haven for engine repairs not covered under warranty, $400.30 to BMW of North Haven to replace ignition coil, and $630.11 to replace the mirror, for a total of $3,429.24.[27] Plaintiff seeks the $3,429.24 in damages, as the value of the Vehicle has been enriched by his expenditure.

On October 22, 2019, Plaintiff, through counsel, served notice on Riverside Auto that he was rescinding the transaction due to violations of the Connecticut Retail Installment Sales Finance Act, and he demanded a return of all sums paid under the Contract. Plaintiff retained possession pending Riverside Auto's agreement to the

---

[24] Id., ¶ 17.
[25] Id., ¶¶ 18-19.
[26] Id., ¶ 20.
[27] Id., ¶ 21; Exhibit 3.

rescission.[28] Sensible agreed to the rescission of the Contract and it returned the amounts paid to it under the Contract.[29] Riverside Auto has failed to return any sums paid by Plaintiff.[30]

Sensible has retained the title to the Vehicle pending a determination of this case against Riverside Auto, but pursuant to the terms of settlement between the parties it has agreed to release the title in accordance with this Court's determination of the rights of the Vehicle between the Plaintiff and the Defendant.[31]

## IV.    PLAINTIFF'S LEGAL CLAIMS

### a.  Truth in Lending Act

TILA is a remedial, strict liability statute that is to be liberally construed, and it requires no proof of deception or actual damages to obtain relief thereunder.[32]  Any defects in the disclosure process, even technical defects, must be recognized without requiring any proof that the consumer was confused.[33] TILA applies to Riverside Auto, because it is a "creditor" within the meaning of TILA.[34]

1.  Burying the Cost of Credit in the Price of Goods

TILA was violated because the price of the Vehicle was increased on account of the Plaintiff's credit. As discussed above, Riverside Auto explained that the price had

---

[28] Id., ¶ 22.
[29] Id., ¶ 23.
[30] Id., ¶ 24.
[31] Id., ¶ 25; Exhibit 4.
[32] *Purtle v. Eldridge Auto Sales*, 91 F.3d 797, 800 (6th Cir. 1996); *McGowan v. King, Inc.,* 569 F.2d 845, 848-49 (5th Cir. 1978); *Redhouse v. Quality Ford Sales, Inc*., 523 F.2d 1, 2 (10th Cir. 1975) (en banc).
[33] *See Jenkins v. Landmark Mortgage Corp*., 696 F. Supp. 1089, 1092, 1095 (W.D. Va. 1988) (citing *Powers v. Sims and Levin*, 542 F.2d 1216, 1219 (4th Cir. 1976)).
[34] *Frazee v. Seaview Toyota Pontiac, Inc*., 695 F. Supp. 1406, 1408 (D. Conn. 1988) ("Where an automobile dealer participates in the preparation of loan-contract documents and has a general knowledge of the credit company's terms, it is an 'arranger of credit' subject to TILA."); *See also* 12 C.F.R. § 226.2(a)(17). *See also* Complaint, ¶ 25.

increased over the advertised price because of Plaintiff's credit  Riverside Auto should have disclosed the increased amount as a finance charge but instead buried it in the cost of the Vehicle. That is a TILA violation.

 TILA requires creditors to disclose clearly and accurately to consumers any finance charge that the consumer will bear under the credit transaction.[35] The regulations implementing TILA, known as "Regulation Z," define "finance charge" to include "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction."[36] Thus, any cost imposed directly or indirectly upon a consumer as a condition of financing is ordinarily considered a finance charge unless subject to some exception.

 TILA's purpose is to ensure the accurate and meaningful disclosure of the cost of consumer credit and to enable consumers to make informed choices in the credit marketplace. Our Supreme Court noted in *Mourning v. Family Publication Services*[37], *Inc.* that unscrupulous merchants might attempt to circumvent TILA's objectives by "burying the cost of credit in the price of the goods sold".   The Court gave an example of how a merchant might attempt to avoid the disclosure requirements:

> Two merchants might buy watches at wholesale for $20 which normally sell at retail for $40.  Both might sell immediately to a consumer who agreed to pay $1 per week for 52 weeks.  In one case, the merchant might claim that the price of the watch was $40 and that the remaining $12 constituted a charge for extending credit to the consumer.  From the consumer's point of view, the credit charge represents the cost which he must pay for the privilege of deferring payment of the debt he has incurred.  From the creditor's point of view, much simplified, the charge may represent the return which he might have earned had he been able to invest the proceeds from the sale of the watch from the date of the sale until the

---

[35] 15 U.S.C. § 1638(a)(3).
[36] C.F.R. § 226.4(a).
[37] 411 U.S. 356 (1973).

date of payment.  The second merchant might claim that the price of the watch was $52 and that credit was free.  The second merchant, like the first, has forgone the profits which he might have achieved by investing the sale proceeds from the day of the sale on.  The second merchant may be said to have 'buried' this cost in the price of the item sold.  By whatever name, the $12 difference between the total payments and the price at which the merchandise could have been acquired is the cost of deferring payment.[38]

The Supreme Court noted that the Federal Reserve Board promulgated regulations (Reg. Z) in order to prohibit this well documented practice against a legislative background acknowledging this concern.  Reg. Z addresses the burying of a "finance charge" as part of the "cash price" by its definition of these terms. Cash price is defined as:

> The price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration.  The term does not include any finance charge.[39]

The regulatory scheme therefore requires sellers to separate the cash price of goods sold on credit from charges that are imposed as an incident of the extension of credit and that are not charged in a comparable cash transaction; those charges must be disclosed as finance charges.

Riverside Auto violated TILA, because the Contract fails to include the $600 increase in sale price as a finance charge, which as Plaintiff learned, was due to the fees charged by Sensible. Instead, the $600 increase was an increase to the price of the Vehicle itself. This is exactly the type of circumvention of TILA's requirements

---

[38] *Id.* at 366, n. 26.
[39] 12 C.F.R. § 226.4.

contemplated by the Supreme Court n *Mourning.* This violates Regulation Z and entitles Plaintiff to statutory damages.[40]

### 2. Improperly Disclosed Finance Charges and Annual Percentage Rate

Riverside Auto told Plaintiff that he was <u>required</u> by the finance company, Sensible, to purchase GAP. However, the $395 GAP charge was disclosed as part of the amount financed in the TILA disclosures instead of as part of the finance charge. The GAP charge was a finance charge, because it was mandatorily included as part of the extension of credit. According to Riverside Auto, the finance company required it and he would not have been able to obtain credit through Sensible unless he spent an additional $395 GAP. This constitutes another TILA violation, because the disclosures are inaccurate and incorrect on the Contract.

15 U.S.C. § 1638(a) speaks to disclosure requirements of a closed end credit transaction and mandate accuracy of the finance charge[41], amount financed[42], and annual percentage rate (APR)[43]. Specifically, Riverside Auto failed to properly and accurately disclose the finance charge, the amount financed and the APR.

Regulation Z defines "finance charge" to include "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." C.F.R. § 226.4(a). Thus, any cost imposed directly or indirectly upon a consumer as a condition of financing is ordinarily

---

[40] 15 U.S.C. § 1638(a)(6); 15 U.S.C. § 1640(a)(2)(A)(ii).
[41] 15 U.S.C. § 1638(a)(3).
[42] 15 U.S.C. § 1638(a)(2)(A).
[43] 15 U.S.C. § 1638(a)(4).

considered a finance charge unless subject to some exception. Consequently, the cost of the GAP is considered a finance charge if a consumer is required to purchase it as an incident to or a condition of the extension of credit, because GAP is sold only in financed transactions and could not be sold, or is not sold, in a cash transaction.[44] GAP is only found in financed transactions, because if a vehicle is totaled in a cash transaction, there is no balance on an installment contract to be paid off.

As a result of the improper disclosures vis a vis the "buried" cost of financing in the price of the goods discussed in the previous section of the brief as well as the mandatory GAP, the APR listed on the Contract is incorrect and considerably lower than reality. While it is disclosed as 19%, if the figures were correctly calculated the APR would be 25.13%.[45] This violates § 1638(a)(4) of TILA.

Finally, the down payment is improperly disclosed. The Contract states that Plaintiff paid a $6,250 down payment, but in reality he paid $6,500. Section 1638(a)(2)(A)(i) requires that in properly disclosing the amount financed that "it shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows… (i) take the principal amount of the loan or the cash price less downpayment and trade-in…" In this instance, the amount finance is in correct, because Riverside Auto failed to credit the entire amount of the down payment.

This violation entitles Plaintiff to statutory damages.[46]

---

[44] GAP is treated in the same manner as any credit insurance, i.e., it is considered to be a financed charge unless it meets the requirements for exclusion of the charge. Reg. Z § 1026.4(b)(10). In order to be excluded, the GAP cannot be required by the creditor. 15 U.S.C. § 1605(b)(1); Reg. Z § 1026.4(d)(1)(i).

[45] Exhibit A.

[46] 15 U.S.C. § 1638(a)(6); 15 U.S.C. § 1640(a)(2)(A)(ii).

### 3. Timing of Disclosures

Riverside Auto forged Plaintiff's electronic signature on the Contract and assigned it to Sensible before he ever saw the document. Thus, Plaintiff was not provided with any of the TILA disclosures until after the Contract was forged and assigned to Sensible. Per 12 CFR § 1026.17(b), "The creditor shall make disclosures before consummation of the transaction." As a result of the forgery, the disclosures were made after the deal was consummated and in violation of Regulation Z and entitles Plaintiff to statutory damages.[47]

### 4. Inaccurate Schedule of Payments

Riverside Auto told Plaintiff that the $250 dollar difference between the actual amount of the down payment he paid, $6,500, and the amount listed on the Contract was partially used to pay for registration fees and partially used to pay the first payment of $103.68 on the Contract. The Contract, however, lists the due date of the first weekly payment as July 26, 2019. Plaintiff was charged for the first payment on July 16, 2019, ten days before the date listed on the Contract's schedule of payments.

Regulation Z §226.18(g) mandates that "[o]ther than for a transaction that is subject to paragraph (s) of this section [a mortgage transaction], the number, amounts, and timing of payments scheduled to repay the obligation." A violation of Regulation Z such as this entitles Plaintiff to statutory damages.[48]

An accurate schedule of payments also results in an accurate APR disclosure. Notwithstanding the above described inaccuracies with respect to the amount financed

---

[47] 15 U.S.C. § 1638(a)(6); 15 U.S.C. § 1640(a)(2)(A)(ii).
[48] 15 U.S.C. § 1638(a)(6); 15 U.S.C. § 1640(a)(2)(A)(ii).

and finance charge in terms of fees and charges imposed, even using the terms stated on the contract results in an understatement of the APR by about a quarter of a percent since the terms of credit is actually shorter than disclosed.[49]

### 5. Damages

Plaintiff is entitled to recover actual damages and statutory damages of double the finance charge of $3,862.28 pursuant to 15 U.S.C. § 1640(a)(2)(A)(ii), capped at $2,000. TILA also provides for a mandatory award of attorney's fees.[50]

### b. Retail Installment Sales Financing Act

Riverside Auto violated the Retail Installment Sales Financing Act, Conn. Gen. Stat. § 36a-770 *et seq.* ("RISFA") in several respects. As shown below, those violations entitle Plaintiff to rescind the Contract.

First, Riverside Auto violated RISFA through its violations of TILA. RISFA incorporates the requirements of TILA by operation of Conn. Gen. Stat. § 36a-771(b).[51] Consequently, each of the TILA violations discussed above is also a violation of RISFA.

Secondly, it violated RISFA because it forged Plaintiff's signature on the Contract in violation of Conn. Gen. Stat. § 36a-771(a) before assigning it to Sensible, at which point he was already bound by the Contract. It obtained the code to digitally forge Plaintiff's signature while he was in Maine, hundreds of miles from Riverside Auto.

---

[49] See Exhibit B for an APR calculation with the first payment due upon consummation of the Contract.
[50] 15 U.S.C. § 1640(a)(3). *See also Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978) (interpreting similar language involving Title VII); *Diaz v. Paragon Motors of Woodside, Inc.*, No. CV-03-6466 CPS RML, 2007 WL 2903920, at *7 (E.D.N.Y. Oct. 1, 2007) *citing Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 188 (4th Cir. 2007).
[51] *James v. Lopez Motors, LLC*, No. 3:16-CV-835 (VLB), 2018 WL 1582552, at *4 (D. Conn. Mar 31, 2018).

Indeed, the document was forged and believed to be assigned to Sensible by the time it was finally presented to Plaintiff. RISFA requires that every Retail Installment Contract "shall be in writing, shall contain all the agreements of the parties and shall be completed as to all essential provisions prior to the signing of the contract by the retail buyer." Moreover, the inaccurate finance charges, amount financed and APR are all inaccurate. Further, Plaintiff physically signed the Contract three days after the date listed on the document and after assignment to Sensible. It is a further violation for Riverside Auto to have Plaintiff sign a back-dated installment contract.

Moreover, if Riverside Auto's statements are true that a portion of the $250 discrepancy in the down payment was for the first installment payment, the payment schedule in the Contract is inaccurate in violation of RISFA. Also, if Riverside Auto's statements are true that a portion of the $250 discrepancy in the down payment was for registration of the Vehicle, Riverside Auto further violated RISFA which requires that the contract state all aspects of the parties' agreement—the amount that he paid for registration is nowhere to be found on the Contract and he actually paid $6,500. Either way, by failing to itemize the remaining $250, the Contract is not "completed as to all essential provisions".

Finally, Riverside Auto violated Conn. Gen. Stat. § 36a-772(a)(3)(C) by charging an APR greater than 19% on the Contract. Indeed, if the finance charges associated with the transaction allocated correctly, the APR is in excess of 25%.

Consumers may claim a rescission as a remedy for violation of RISFA. *See e.g., Barco Auto Leasing v. House,* 202 Conn. 106, 113 (1987). Plaintiff demanded a rescission of the Contract and, despite Sensible's agreement to rescind the Contract,

13

Riverside Auto refused to return the amounts paid by Plaintiff and participating in the deal. Indeed, Plaintiff provided notice to Riverside Auto before initiating a lawsuit that it was demanding rescission and was only met with refusal. Plaintiff is entitled to a rescission of the Forged Contract due to the violations of RISFA the $6,500 down payment. Plaintiff also claims that $3,429.24 in repair costs as damages, as Vehicle's worth has been enriched.[52]

Additionally, Plaintiff seeks an order permitting him to sell the Vehicle and to apply the sale proceeds towards his claim for damages. Any amounts received in excess of the judgment will be remitted to Riverside Auto.

### c. Connecticut Unfair Trade Practices Act

Connecticut courts use the "cigarette test"[53] in determining whether a trade practice is unfair under CUTPA:

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus a violation of CUTPA may

---

[52] Courts have allowed buyers to recover repairs or the cost of improvements in situations with fraudulent conduct leading to the rescission. *Clay v. Brand*, 365 S.W.2d 256, 258 (Ark. 1963) (Purchasers permitted to recover improvements made to property or remove improvements therefrom in action for rescission due to fraudulent conduct by seller.). In the instant matter, the removal of the repairs to the Vehicle is not practical and would render the Vehicle inoperable.
[53] *See FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233 (1972).

be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy.... In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice....[54]

Riverside Auto's statutory violations of TILA invoke the "public policy" prong of an unfair trade practice.

Riverside Auto's TILA violations as described above are also CUTPA violations in that they offend the public policy prong of the cigarette test. The Connecticut Supreme Court held in *Cheshire Mortg. Service, Inc. v. Montes*[55] that a TILA violation may also constitute a CUTPA violation if the consumer can show substantial injury, generally in the form of a monetary loss.[56] More succinctly, the TILA violation must rise above a disclosure violation. In the instant matter, the mandatory GAP and increased price, which were charged incidentally to the extension of credit constituted a substantially injury in the form of monetary loss to Plaintiff. It was improperly disclosed, or "buried" in the cost of the goods, and would have not been paid in a similar cash transaction. By burying the cost in the price, Plaintiff was deprived of a meaningful opportunity to compare credit terms. Indeed, it was not properly disclosed that he was required to pay a 25% APR, six points higher than the legal limit in Connecticut.[57]

---

[54] *Ulbrich v. Groth*, 310 Conn. 375, 409–10, 78 A.3d 76, 100 (2013)

[55] 223 Conn. 80, 114 (1992)

[56] *Id.,* 113.

[57] "A retail seller of motor vehicles may charge, contract for, receive or collect a finance charge expressed as an annual percentage rate on any retail installment contract covering the retail sale of a motor vehicle in this state, which charge shall not exceed … on sales made on or after October 1, 1987… used motor vehicles of a model designated by the manufacturer by a year more than two years prior to the year in which the sale is made, nineteen per cent." Conn. Gen. Stat. § 36a-772.

Courts have also recognized that TILA violations may serve as the basis for *per se* violations under § 42-110-28(b)(23)[58]: "Because the court in this case found that Atlantic violated TILA and RISFA, the court finds there is sufficient evidence that Atlantic engaged in unfair and deceptive acts in commerce or trade in connection with this transaction in violation of CUTPA."[59] The *Tirado* court reasoned:

> § 42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides: "It shall be an unfair or deceptive act or practice for a new car dealer or a used car dealer to violate any provision of a federal or state statute or regulation concerning the sale or lease of motor vehicles." "The Connecticut Supreme Court has held ... that violations of the Federal Truth in Lending Act and of General Statutes § 36-224l (limiting charges on secondary mortgage loans) are unfair trade practices in violation of CUTPA ... A plaintiff who can establish a violation of either of these statutes does not need to allege or prove a violation of CUTPA in order to obtain substantive relief. If the plaintiff's lawyer is worth her salt, however, the complaint will additionally allege a CUTPA violation, because General Statutes § 42-110g(d) allows the court to award reasonable attorneys fees to the successful plaintiff."[60]

*Tirado* bears close similarity to the instant matter in that Ms. Tirado's claims also involved a financing agreement with an improperly disclosed financing term (vendor's single interest insurance) and a retail installment sales contract already pegged at a 19% APR. The *Tirado* court also found that the disclosure violation and an APR exceeding 19% violated TILA.[61]

---

[58] Section 42–110b(c) of CUTPA provides that the Department of Consumer Protection (the 'DCP') may issue regulations that establish what acts, practices, or methods shall be deemed unfair or deceptive under CUTPA.

[59] (Footnote omitted.) *Tirado v. Ofstein*, No. HHDCV054014648S, 2008 WL 902506, at *16 (Conn. Super. Ct. 2008).

[60] *Id.*, at *15 *citing Pechiney Corp. v. Crystal,* 43 Conn. Supp. 91, 99-100, 643 A.2d 319 (1994) [10 Conn. L. Rptr. 606]*, overruled in part on other grounds by Jade Aircraft Sales v. Crystal,* 236 Conn. 701, 674 A.2d 834 (1996).

[61] *Id.* at *2; *See also Alexis v. PMM Enterprises LLC,* No. 3:17-CV-1622 (MPS), 2018 WL 5456491, at *6 ("If Empire had included the $1,100 bank fee in the finance charge as required by the TILA, the APR for the Alexises contract would have risen above the statutory maximum rate. Empire's misrepresentation of the purchase price of the vehicle not only violated the TILA, then, it also allowed Empire to obscure a violation of Connecticut's Retail Installment Sales Financing Act ('RISFA').")

As stated above, regulations regarding the conduct of car dealerships issued by the DCP provide that it is a *per se* violation for a car dealership to fail to comply with a state or federal law concerning the sale of motor Vehicles.[62] Riverside Auto committed several violations of statutes and regulations relating to the sale of motor vehicles.

First, it sold the Vehicle for more than the advertised price, a *per se* violation of CUTPA pursuant to Conn. Agency Reg. § 42-110b-28(b)(1). Failing to sell a vehicle for the advertised price constitutes a CUTPA violation. "Here, the plaintiff's alleged ascertainable loss is the difference between the price he actually paid (plus the dealer conveyance fee) and the advertised price, the latter being the ceiling as a matter of law, according to the plaintiff's theory of the case. That is, according to the plaintiff, the defendant could not, as a matter of law, collect a purchase price from the plaintiff (or any putative class member) that was higher than the advertised price, regardless of the plaintiffs (or any putative class member's) knowledge of the advertised price."[63]

Additionally, Riverside Auto's failure to disclose the dealer conveyance in the advertisement is a violation of Conn. Gen. Stat. § 14-62a(a), which states

> No dealer licensed under the provisions of section 14–52 shall advertise the price of any motor vehicle unless the stated price in such advertisement includes the federal tax, the cost of delivery, dealer preparation and any other charges of any nature, except that such advertisement shall (1) state in at least eight-point bold type that any state or local tax, registration fees or dealer conveyance fee or processing fee, as defined in subsection (a) of section 14–62, is excluded from such advertised price, and (2) separately state, in at least eight-point bold type, immediately next to the phrase "Dealer Conveyance Fee," the amount of such dealer conveyance fee or processing fee.

---

[62] Conn. Agency Reg. § 42–110b–28(b)(23).
[63] *Konikowski v. Stephen Cadillac GMC, Inc.*, No. X03HHDCV176078564S, 2017 WL 7048666, at *4 (Conn. Super. Ct. Dec. 27, 2017).

By not disclosing the dealer conveyance fee until he was presented with the purchase order, Riverside Auto also violated Conn. Gen. Stat. § 14-62(b)(1), which states "[t]he selling price quoted by any dealer to a prospective buyer shall include, separately stated, the amount of the dealer conveyance fee and that such fee is negotiable. No dealer conveyance fee shall be added to the selling price at the time the order is signed by the buyer." Pursuant to Conn. Agency Reg. § 42–110b–28(b)(23), these are *per se* CUTPA violations. The conveyance fee is here was $300 is a significant increase over the cash price of $16,500, which had already been raised $995, creating a total increase of $1,295 over the advertised price in undisclosed fees.

Riverside Auto also violated Conn. Gen. Stat. § 14-62(b)(2) by including the GAP, which was not specifically ordered. Section 14-62(b)(2) states: "No dealer shall include in the selling price a dealer preparation charge for any item or service for which the dealer is reimbursed by the manufacturer or <u>any item or service not specifically ordered by the buyer</u> and itemized on the invoice." (Emphasis supplied.)

As a result of Riverside Auto's conduct, Plaintiff has suffered ascertainable losses of money or property in that he was charged $600 over the advertised price, was charged $300 for the dealer conveyance fee and $395 for the GAP, as well as the sales tax and finance charges thereon.

For Riverside Auto's violations of CUTPA, Plaintiff is entitled to his actual damages plus punitive damages and a reasonable attorney's fee.[64]

---

[64] Conn. Gen. Stat. §42-110g(d).

CUTPA provides at Conn. Gen. Stat. § 42-110g(a) that a court "may provide such equitable relief as it deems necessary or proper."  Plaintiff has claimed a revocation of acceptance and has also asserted a rescission for the violation of RISFA. Bell also seeks, as an alternative to those claims, an order that Plaintiff be permitted to sell the Vehicle and apply an proceeds to the judgment. Any amount in excess of the judgment will be remitted to Riverside Auto.

### d.  Punitive Damages

"[T]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law... [including] punitive damages and attorney's fees. Section 42– 110g does not specify how punitive damages are to be measured; however, the award should serve the broad remedial goals of eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices."[65]

Connecticut courts have recognized the deterrent aim of punitive damages by employing a relatively large multiplier in situations where the actual damages are comparatively small. In *Larobina v. Home Depot USA, Inc.*,[66] the appellate court upheld a 10x multiplier when compensatory damages were only $100 on the theory that "CUTPA is aimed at eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices. To achieve that result, CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts. Encouraging claimants to walk away from unfair or deceptive

---

[65] (Internal citations and quotation marks omitted.) *Societa Bario E. Derivati v. Kaystone Chem., Inc.*, No. 5:90-CV-599 (EBB), 1998 WL 182563, at *10 (D.Conn. 1998).
[66]  76 Conn.App. 586 (2003).

practices does not serve to help enforce the ban on unfair trade practices and prevents CUTPA from achieving the remedial effect which the legislature desired."[67]

This approach has been similarly recognized in *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 149 (2011) (6x multiplier); *Benham v. Wallingford Auto Park, Inc.*, No. CV020459418S, 2003 WL 22905163, at *5 (7x multiplier); *Odell v. Wallingford Mun. Fed. Credit Union*, No. CV106012228S, 2013 WL 4734783, at *45 (3x punitive damages under CUPTA on top of 3x civil theft multiplier); *All Am. Custom Pools & Spas v. Schwindeman,* No. FSTCV044001335S, 2007 WL 866238, at *6. (Conn. Super. Ct. March 9, 2007) ($1 compensatory damages and $25,000 punitive damages).

Riverside Auto's conduct in this case was particularly egregious and warrants an award of punitive damages to Plaintiff. Chiefly, it forged Plaintiff's signature on the Contract and imposed over a thousand dollars in hidden fees as part of the transaction. A suggested amount of punitive damages is $5,000. This sort of conduct needs to be reined in to serve as a deterrent against future similar violations.

### e.  Attorney's Fees

Plaintiff is entitled to an award of a reasonable attorney's fee under TILA and CUTPA. He seeks $8,270.

Consumers are to be awarded TILA attorney fees in "any successful action."[68] The award, pursuant to TILA, is mandatory.[69] Because the federal and state governments lack the resources to adequately police the marketplace and to protect

---

[67] *Id.* at 596.
[68] 15 U.S.C. § 1640(a)(3).
[69] *Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978)(Title VII).

consumers, federal and state consumer protection laws depend upon the private enforcement by aggrieved consumers. The ability of consumers to bring such cases depends upon the availability of private attorneys willing to bring these cases against well-heeled businesses. Accordingly, TILA provides that successful litigants are entitled to recover a reasonable attorney's fee based upon the work performed in the case. The availability of such fees enable private attorneys to handle cases that involve small dollar amounts but which raise complex legal issues.

Plaintiff is also entitled to fees under CUTPA.  Conn. Gen. Stat. §42-110g(d) provides: "in any action brought by a person under this section, the court may award, to the Claimant, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." The Connecticut Supreme Court has held that a Plaintiff who establishes a CUTPA claim is entitled to attorney's fees. [70]  Specifically, the Court stated, "Since CUTPA expressly permits the court to award 'costs and reasonable attorney's fee based on the work reasonably performed by an attorney' *General Statutes* § 42-110g (d); the [parties claiming CUTPA violations] are clearly entitled to such fees.[71]

The award of attorney's fees is an extremely important component in promoting private enforcement of the CUTPA:

The policy behind CUTPA, namely, to encourage litigants to act as private attorneys general and to bring actions for unfair or deceptive trade practices, is furthered by our conclusion. Integral to effecting this policy, and reflected in the

---

[70] *Barco Auto Leasing Corp. v. House*, 202 Conn. at 120.
[71] *Id. See also* ROBERT M. LANGER ET AL., CONNECTICUT UNFAIR TRADE PRACTICES (2003).

> 1976 amendment, is the desire to encourage attorneys to accept and litigate
> CUTPA cases. CUTPA cases, however, may entail long hours with little
> likelihood of an award that will cover reasonable expenses. For this reason,
> General Statutes § 42-110g (d) offers an attorney who accepts a CUTPA case
> the prospect of recovering  reasonable fees and costs.[72]

Denying attorney's fees would have a chilling effect and would be contrary to the

purpose of the fee-shifting statute.

In determining a reasonable fee, the Second Circuit applies the presumptively-

reasonable-fee standard, which involves multiplying the hours reasonably expended by

a reasonable hourly rate.  *McDaniel v. County of Schenectady*, 595 F.3d 411, 417, n.2

(2d Cir. 2010). This presumptively reasonable fee amount is frequently referred to as

the "lodestar" amount.  In determining the presumptively reasonable fee, a court

"engage[s] in a four-step process: (1) determine the reasonable hourly rate; (2)

determine the number of hours reasonably expended; (3) multiply the two to calculate

the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive

at the final fee award." *Silver v. Law Offices Howard Lee Schiff, P.C.*, 2010 WL

5140851, at *1 (D. Conn. Dec. 16, 2010) (citations omitted).

A district court also considers the factors outlined in in *Johnson v. Ga. Highway*

*Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). See *Arbor Hill Concerned Citizens*

*Neighborhood Ass'n v. Cnty of Albany*, 522 F.3d 184 (2d Cir. 2008). The *Johnson*

factors include:

(1) the time and labor required;

---

[72] *See Gill v. Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 33 App. Ct. 1987).  *See also Fabri v. United Techs. Int'l, Inc.*, 193 F. Supp. 2d 480, 486 (D. Conn. 2002), where not awarding attorney's fees, "would be contrary to the purpose of the fee-shifting statute, to encourage the prosecution of meritorious claims for violation of the substantive provisions of CUTPA."; and *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 617, (1981), where recovery of attorneys' fees, "serves to encourage private CUTPA litigation."

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee for similar work in the community;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation and ability of the attorneys;

(10) the undesirability of the case;

(11) the nature and length of the professional relationship with the client; and,

(12) awards in similar cases.

Plaintiffs, as the prevailing party on fee-shifting claims, bear the burden of showing the presumptively reasonable fee. See *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994). The defendants, however, bear the burden of justifying any reduction to that presumptively reasonable lodestar amount. See *U.S. Football League v. National Football League*, 887 F.2d 408, 413 (2d Cir. 1989) ("We note that a party advocating the reduction of the lodestar amount bears the burden of establishing that a reduction is justified."); *see also Evans v. Connecticut*, 967 F. Supp. 673, 692 (D. Conn. 1997) ("The party asking the court to depart from the lodestar amount bears the burden of proving that such a departure is necessary to the calculation of a reasonable fee").

While it would be inappropriate to consider only one of these twelve guidelines in setting attorney's fees awarded, it is not necessary to consider every single guideline; it suffices to "consider the full panoply of factors." *Riggio v. Orkin Exterminating Co., Inc.*,

23

58 Conn. App. 309 (2000).  Additionally, the list of factors is not exclusive; the court may "assess the reasonableness of the fees requested using any number of factors…" *Smith v. Snyder,* 267 Conn. 456, 480 (2004).  In a case such as this, the underlying policy of enabling consumers to retain qualified counsel are best satisfied by awarding reasonable hourly rates for work properly performed.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* the Second Circuit clarified the proper analysis for a district court to undertake in exercising its considerable discretion in awarding attorney's fees.  A court is to

> consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay…
>
> [I]n determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.[73]

Essentially, the Second Circuit directs district courts to consider panoply factors when considering a fee request:

> The meaning of the term "lodestar" has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use.[74] We think the better course—and the one most consistent with attorney's fees jurisprudence—is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's

---

[73] 522 F.3d at 184.
[74] "While we do not purport to require future panels of this court to abandon the term—it is too well entrenched—this panel believes that it is a term whose time has come." (Footnote in original, numbering modified herein.)

fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.[75]

Attorney Blinn's claimed hourly rate of $400/hour has been approved in multiple decisions by federal and state court judges.  Consequently, the undersigned's hourly rates and the rates of his staff have been approved in numerous court decisions, many of which have involved claims against auto dealers. *E.g., Bristol v. Lake Pocotopaug Auto, LLC*, No. 3:13cv911JBA (D. Conn. Jun. 27, 2014)(found the hourly rates and hours claimed to be reasonably billed by a  "well respected consumer law attorney and firm"); *Franco v. A Better Way Wholesale Autos, Inc.,* No. 3:14cv422 VLB (D. Conn. May 31, 2016); *Linsley v. FMS Investment Corp.*, No. 3:11cv00961VLB (D. Conn. June 2, 2014); *Wise v. Cavalry Portfolio Services,* LLC, No. 3:09-cv-00086CSH (D. Conn. Sept. 23, 2013); *Rodriguez v. A Better Way Wholesale Autos, Inc.*, No. UWY-CV-15-6027405S (Conn. Super. Ct. Feb. 1, 2016); *A Better Way Wholesale Autos, Inc. v. Gause*, No. UWY-CV-16-6031850 (Conn. Super. Ct., Dec. 30, 2016) (found hourly rate of $400 and hours claimed to be appropriately billed by a "highly experienced consumer affairs lawyer" whose "briefs and other filings to have been produced in a highly professional and efficient manner" and who "has received an excellent result for his client."); *A Better Way Wholesale Autos, Inc. v. Saint Paul*, UWY-CV-16-6031881 (Conn. Super. Ct. Dec. 30, 2016) (finding attorney's hourly rate of $400 and the rates of

---

[75] *Arbor Hill*, supra at 190.

his staff as appropriate by a "highly experienced consumer affairs lawyer" whose briefs and other filings were "produced in a highly professional and efficient manner" and who has "received a good disposition for his client"); *A Better Way Wholesale Autos, Inc. v. Oteng*, UWY-CV-16-6031616 (Conn. Super. Ct. Jan. 3, 2017) (approving attorney's hourly rate of $400 and the rates of his staff by a "highly experienced consumer affairs lawyer" whose "briefs and other filings have been produced in a highly professional and efficient manner" and who "received an excellent result for his clients."); *Harper-Wilson, et al v. A Better Way Wholesale Autos, Inc.*, NNH-cv-15-6056633 (Conn. Super. Ct. Apr. 3, 2017) (confirming arbitrator's award of attorney's fees billed at the hourly rate of $400); *Dixon v. A Better Way Wholesale Autos, Inc.,* Order Re Motion for Supplemental Attorney's Fees, 3:15-cv-00691-AWT (May 16, 2017, D. Conn.); *Panfili v. Rides by Ryan LLC*, 3:17-cv-290(SRU) (D. Conn. Jul. 16, 2018) (rate of $400/hr. previously approved in this district); *James v. Lopez Motors, LLC*, 3:16-cv-835(VLB) (D. Conn. Jul. 20, 2018) (order approving attorneys fees at hourly rate of $400); *Alexis v. PMM Enterprises, LLC, 3:17-cv-1622(MPS) (D. Conn. Oct. 29, 2018)(rate of $400/hr. reasonable); Negron v. Patriot Auto Sales, LLC*, No. 3:17-CV-583 (JCH), 2019 WL 4463440, at *3 (D. Conn. Sept. 17, 2019) (Rate of $400/hr. previously approved in this district and considered reasonable).

Additionally, in 2012, United States Magistrate Judge Holly Fitzsimmons surveyed recent cases, noting that many approved hourly rates of $400/hr and more for comparably experienced attorneys, and Judge Fitzsimmons approved rates of $485/hr and $400/hr for attorneys in that case.  *Valley Housing Ltd Partnership v. City of Derby*, 802 F.Supp.2d 359 (D. Conn. 2011).

Attorney Brendan Mahoney's time is billed at $275/hour. Attorney Mahoney has been admitted to the Connecticut bar for five years and has no disciplinary record.  His claimed hourly rate of $275 is well within the standards for lawyers of his experience. His rate has been approved in United States District Court in Connecticut on several occasions. *Negron v. Patriot Auto Sales, LLC*, supra at *4 (D. Conn. Sept. 17, 2019)[76]; Ruling and Order on Motion for Default Judgment, *Alexis v. PMM Enterprises LLC*, 3:17-cv-01622-MPS (D. Conn. Oct. 29, 2018); Order on Plaintiff's Motion for Attorney's Fees, *Panfili v. Rides By Ryan, LLC*, 3:17-cv-00290-SRU (D. Conn. July 16, 2018).

There are several other *Johnson* factors that support the fees sought in this case in addition to past approval of the attorneys' hourly rates. First, the fee in this case was contingent in that Plaintiff's attorneys would not be paid if they do not prevail in this action. While no upward adjustment to the time-value is sought because of this factor, the contingent-nature of the fee agreement supports the hourly rates sought. The risk undertaken by counsel justifies a higher hourly rate than would perhaps otherwise be appropriate in a fixed fee situation. The risk is clearly apparent here, because Plaintiff is chasing a non-appearing defendant. Significant work will still be required to secure recovery for the Plaintiff and for his attorneys to actualize remuneration.

Skill is factor in determining the fee herein. The TILA violations in this matter required a thorough dissection of the Contract and a detailed a technical analysis of Regulation Z of TILA.

---

[76] The *Negron* Court also approved the paralegal rate of $150 per hour, *Id.*

Another factor is the dearth of lawyers willing to handle this type consumer cases against well heeled defendants who mount vigorous defenses, challenges, and appeals. Awarding meaningful fees in these cases is necessary to ensure that consumers are able to find counsel to vindicate cases where businesses have caused them harm.

As more fully described in the Declaration of Daniel S. Blinn, an appropriate fee award in this matter would be $8,270. 0 in light of the time expended thus far in the matter as well as for anticipated expenses in securing the judgment.

**DAMAGES**

Plaintiff's damages are as follows:

Liquidated Damages

| | |
|---|---|
| Down Payment: | $6,500 |
| Repair Costs: | $3,429.24 |
| Subtotal: | $9,929.24 |

Statutory damages

| | |
|---|---|
| TILA: | $2,000 |

Punitive Damages   (CUTPA)          $5,000

Attorney's Fees:                          $8,270


**TOTAL**                                    **$25,199.24**

**V.    CONCLUSION**

In light of the foregoing, judgment should enter against Riverside Auto in the amount of $25,199.24. Plaintiff also seeks an order from this Court requiring Sensible release title to Plaintiff so that he may sell the Vehicle in order to apply the proceeds to the judgment.

PLAINTIFF, BILLIE CONLEY, JR.

By:   /s/ *Daniel S. Blinn*
       Daniel S. Blinn (ct02188)
       Brendan L. Mahoney (ct29839)
       Consumer Law Group, LLC
       35 Cold Spring Road, Suite 512
       Rocky Hill, CT  06067
       (860) 571-0408
       Fax: (860) 571-7457
       dblinn@consumerlawgroup.com
       bmahoney@consumerlawgroup.com

CERTIFICATION

I hereby certify that on May 14, 2020, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Daniel S. Blinn*
Daniel S. Blinn

Annual Percentage Rate Calculation

Prepared using software associated with the

publications of the National Consumer Law Center

April 27, 2020

Conley v. Riverside Auto, Case # 3:20-CV-284-CSH
APR calculation

| | |
|---|---|
| Amount Financed: | $11,316.80 |
| Finance Charge: | $4,857.28 |
| Total of Payments: | $16,174.08 |
| Amount of most common payment: | $103.68 |
| Number of Payments (Weekly): | 156 |
| Number of days in irregular first period: | 10 |
| Amount of any irregular first payment: | NA |
| Amount of any irregular final payment: | NA |
| | |
| Annual Percentage Rate (APR): | 25.1343% |
| APR (rounded to 3 places): | 25.134% |
| APR (rounded to 2 places): | 25.13% |

Annual Percentage Rate Calculation

Prepared using software associated with the

publications of the National Consumer Law Center

May 8, 2020

Conley v. Riverside Auto
Schedule of Payments APR calculation

| | |
|---|---|
| Amount Financed: | $12,311.80 |
| Finance Charge: | $3,862.28 |
| Total of Payments: | $16,174.08 |
| Amount of most common payment: | $103.68 |
| Number of Payments (Weekly): | 156 |
| Number of days in irregular first period: | 1 |
| Amount of any irregular first payment: | NA |
| Amount of any irregular final payment: | NA |
| Annual Percentage Rate (APR): | 19.2322% |
| APR (rounded to 3 places): | 19.232% |
| APR (rounded to 2 places): | 19.23% |